2021 IL App (2d) 190003-U
No. 2-19-0003
Order filed June 18, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-129 |
| SENTORO DUNN, | ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   There was no error in the first-stage dismissal of defendant's postconviction claim that plea counsel was ineffective for advising him that he could plead guilty and still appeal the trial court's denial of his motion to dismiss the charges based on the State's alleged breach of a cooperation agreement.  Defendant alleged that, had counsel properly advised him, he would have declined the State's plea offer and gone to trial to preserve the breach issue. However, defendant failed to allege facts establishing that such a decision would have been rational under the circumstances, particularly given the overwhelming evidence against him and the favorability of the plea offer.

¶ 2   In 2012, defendant, Sentoro Dunn, was charged with (1) unlawful possession of, with the intent to deliver, 900 grams or more of a substance containing cocaine, which was punishable by

a prison term of at least 15 and no more than 60 years (720 ILCS 570/401(a)(2)(D) (West 2012)) and (2) unlawful possession of 900 grams or more of a substance containing cocaine, which was punishable by a prison term of at least 10 and no more than 50 years (*id.* § 570/401(a)(2)(D)). In 2015, defendant obtained new counsel and moved to enforce the State's alleged agreement to dismiss the charges based on defendant's successful cooperation with a separate federal investigation into drug trafficking in a different location. After an evidentiary hearing, the trial court denied the motion. In 2017, represented by his third attorney, defendant pleaded guilty to a reduced charge of possession with the intent to deliver 400 grams or more but less than 900 grams of a substance containing cocaine (*id.* § 570/401(a)(2)(C)) and was sentenced to 14 years' imprisonment. Defendant did not file a timely postjudgment motion. Instead, he filed an appeal that was dismissed. *People v. Dunn*, No. 2-17-0414 (2018) (unpublished summary order under Supreme Court Rule 23(c)).

¶ 3    In 2018, defendant petitioned *pro se* under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), claiming that his third attorney had been ineffective for advising him that he could plead guilty and still appeal the denial of his motion to dismiss the charges. The trial court summarily dismissed the petition. Defendant appealed. We affirm.

¶ 4                                I. BACKGROUND

¶ 5    On February 28, 2012, defendant was charged after he and Leamon Cavitt, who was charged separately, allegedly purchased cocaine from undercover police in Carpentersville on or about January 18, 2012. Defendant hired Warren Breslin, a private attorney. The cause was continued numerous times. At a hearing on January 23, 2014, Assistant State's Attorney Kelly Orland noted that the parties were working on a potential agreement that would depend on the

outcome of Cavitt's trial. On June 27, 2014, Orland told the court that the State had made defendant a plea offer, good until October 10, 2014.

¶ 6    On October 10, 2014, Breslin told the court, Judge John A. Barsanti presiding, "[W]e have issues with this case where an offer now is extended that we would not be able to accept," as the plea negotiations had broken down. He anticipated moving to dismiss the charges, based on "the obligation of the State," and that he might have to withdraw as defendant's counsel. Further, defendant's presence at the next hearing would have to be waived because he would be aiding in a federal drug investigation. The court gave defendant until November 12, 2014, to file the motion.

¶ 7    On November 12, 2014, Breslin moved to dismiss the indictment, alleging as follows. On January 18, 2012, defendant was arrested. In February 2012, he was released on bond, based on the State's assurance that, if he agreed to work with federal and local law enforcement agencies, he would receive consideration commensurate with his performance. Later, Orland assured Breslin that ultimately defendant's case would be dismissed "if he continued what proved to be cooperation leading to serious arrests and prosecutions." In reliance on such assurances, defendant continued his undercover work at great risk to himself and his family.

¶ 8    The motion alleged that, based on defendant's undercover work, no federal charges were brought against him. Orland expressed dissatisfaction to Breslin, telling him that defendant should have to pay some penalty in the state case. As scheduling progressed, Orland told Breslin that she would not agree to dismiss the charges but would consider agreeing to a sentence of probation on a plea to a reduced charge. Later, however, even though defendant fulfilled his cooperation agreement, the State insisted that a plea agreement would have to include a 10-year prison term on a Class X charge. Defendant rejected these terms, and the State asked the court to set the case for trial. Defendant argued that the court should dismiss charges because, in reliance on the State's

earlier assurance, defendant and his counsel had not requested or received any discovery, and because defendant had upheld his original agreement with the State.

¶ 9    On December 11, 2014, the State responded to the motion as follows.  The State agreed to reduce defendant's bond so that he could cooperate with federal investigators and avoid federal prosecution in a separate drug case in Wisconsin, but neither state nor federal prosecutors promised him a reduction in the state charges.  On February 1, 2012, Orland, Breslin, Ron Perrine, a Rockford police officer assigned to the State Line Area Narcotics Task Force (SLANT), and a second agent met with defendant at the jail.  Orland agreed to a reduced bond so that defendant could work in the federal investigation, but she made no other promises.  On February 2, 2012, defendant was released on a reduced bond.  On February 28, 2012, he was indicted.

¶ 10    The State alleged further that, afterward, Breslin asked Orland to agree to a probation sentence for defendant in consideration of his undercover work.  Orland told him that she could not make an offer until defendant completed his work and that, even then, probation would not be an option.  In November 2013, Perrine informed Orland that defendant had completed his assignment successfully and would not face federal charges. Neither federal agents nor the federal prosecutor ever told defendant or Breslin that the state case would be dismissed.  On November 7, 2013, defendant and Breslin met with Orland and two Carpentersville police detectives.  Defendant provided information about Cavitt.  Orland told him that the State was making no promises.  Much later, Orland offered defendant a 10-year sentence in return for his cooperation in Cavitt's case. That offer expired on October 10, 2014, leaving no active agreement between the State and defendant.  Thus, his motion should be denied.

¶ 11    Breslin withdrew.  The trial court appointed Ronald Dolak, an assistant public defender, to represent defendant.  On September 24, 2015, Dolak filed an "Amended Motion to Enforce [Plea]

Agreement." It alleged that defendant, through Breslin, and the State, through Orland, had entered into an agreement whereby defendant would cooperate with state and federal drug investigators and the State would dismiss the present charges or agree to a guilty plea to a reduced charge and a sentence of probation. The State did not tender discovery to Breslin and assured him that it would not be needed, given the agreement. Defendant completed his obligations under the agreement, but Orland later told Breslin that she would not honor the agreement. The State had violated the agreement and the court should require specific performance.

¶ 12 On September 30, 2015, the court heard the amended motion. We recount the evidence.

¶ 13 Breslin testified on direct examination as follows. At the initial meeting in February 2012 with Orland, Breslin, and law enforcement agents, defendant signed an agreement to cooperate with and provide truthful information to the agents. Orland told defendant that the results of his cooperation would be considered in the pending state case, but no promises were made. Defendant answered the agents' questions. Orland and Breslin agreed to seek a bond reduction so that defendant could be released.

¶ 14 Breslin testified that, about two months after the court reduced defendant's bond and he was released, Orland told Breslin privately that the agents were very happy with defendant's work and were hopeful that his information would greatly help them. As a result, she and Breslin agreed to waive defendant's appearance at most hearings.

¶ 15 Breslin testified that, on "perhaps the third court date" on which they met, Orland told him that "if [defendant did] the work that he [was] doing or [was] about to do, that this case would be dismissed." Orland was referring to the state prosecution; she had "nothing to say about the Federal case at all." However, she specified that the State would dismiss the case only if defendant

was successful in what he had agreed to do for the agents. Orland provided no further details. Breslin relayed Orland's message to defendant.

¶ 16    Breslin testified that his next conversation with Orland about the case occurred on September 12, 2013, during a conference in Judge Barsanti's chambers while defendant waited outside. The three participants discussed waiving defendant's appearance at future hearings and the possible return of his bond to Breslin in part payment of his fees. Breslin requested that the court ask defendant whether he would want to agree to the bond return that day, because if the court dismissed the case while defendant was elsewhere undercover, Breslin could get the refund processed. Breslin did not ask the court to dismiss the case.

¶ 17    Breslin testified that he and Orland next spoke about the case shortly after the in-chambers conference and well before November 12, 2014. Orland told Breslin that he had learned that the federal prosecutors had decided not to pursue charges against defendant. She expressed dissatisfaction with this development and told Breslin, " 'I have to give him something on this. I can't just dismiss it. It's not fair that he gets nothing and walks away.' " Orland stated her "preliminary opinion" that defendant should receive nonreporting probation. Breslin responded that although that would violate Orland's promise, he did not "strongly object to that." Breslin relayed her statements to defendant and assured him that, although Orland was "backpedaling" on her prior offer, the new proposal would enable him to report by mail and not worry about his safety.

¶ 18    Breslin testified that the only subsequent conversation with Orland about the disposition of the case was when she gave him a written offer under which defendant would plead guilty to a reduced charge and accept a 10-year prison term. At the time, Breslin believed that the offer of a deal without prison or jail time was still in place. He relayed Orland's message to defendant.

¶ 19    Breslin's testimony circled back to November 7, 2013, when he was present with Orland as defendant spoke to Carpentersville police officers about Cavitt's case. Breslin received a proffer sheet explaining that nothing was promised for defendant's cooperation against Cavitt. Neither Orland nor the officers said anything about a possible agreement or other disposition in defendant's case. Breslin regarded the proffer as essentially a formality, as he believed that the State had agreed to dismiss all the charges against defendant, or at least to seek no more than probation, if he performed satisfactorily in the Wisconsin investigation. That continued to be his understanding until Orland's offer of a 10-year sentence in return for a reduced felony charge.

¶ 20    Breslin testified that the agreement to dismiss the charges in return for defendant's service to the Wisconsin investigation was never put into writing. Defendant fulfilled his part of the agreement by doing what he was asked and obtaining information that the agents found extremely valuable. In reliance on the State's promises, the defense did not contest any issues in the case and filed no motions other than to reduce the bond so that defendant could be released. Thus, Breslin received no discovery, because he never requested any.

¶ 21    Breslin testified on cross-examination as follows. First, Orland never provided any written outline of the terms of an agreement. Second, Orland's oral offer to dismiss the charges came about two months into the case; she made it privately in the courtroom. Third, Breslin was uninvolved in the federal case and did not know what charges defendant was facing there.

¶ 22    Breslin testified that, shortly before the February 2012 meeting at the jail, he received and signed proffer letters from Orland and the federal prosecutor in Wisconsin. Both letters stated that no promises were being made in return for defendant's cooperation with the Wisconsin investigation. The only other writing that Orland gave him indicating a plea offer or agreement was the written offer for a 10-year sentence to a reduced charge.

¶ 23    Breslin testified that, after September 2013, he believed that he had a clear agreement with Orland—the case would be dismissed if defendant cooperated with the federal investigators to their satisfaction. He admitted that, on October 3, 2014, he wrote to Kane County State's Attorney Joseph McMahon about defendant's case. In his letter (admitted into evidence), Breslin asked McMahon to review the case. He noted defendant's cooperation with the federal investigation and the documented threats against defendant for his undercover work. Breslin told McMahon that the proposed 10-year sentence in the state case would undermine the government's efforts to protect defendant and would be "tantamount to a death sentence." Breslin's letter made no mention of Orland's alleged oral agreement with him or her later mention of a possible sentence of probation on a lesser charge. On redirect, Breslin explained that, by the time he wrote McMahon, Orland had "backpedaled" to offering probation on a reduced charge.

¶ 24    Defendant testified on direct examination as follows. Shortly after he was arrested, two federal agents approached him and asked him whether he knew certain people who were involved with moving drugs in Illinois and Wisconsin; he said yes. Defendant told Breslin about the interview. At the February 2012 the meeting at the jail, Orland told defendant that, if he wanted to help himself and "make this case go away," he had to "get on board and do whatever the [agents said]." The agents told him that he could help himself with the federal case too, although he had not yet been charged there. Orland told defendant that the agents would first need to see what he had to offer. She provided a paper that defendant signed. He spoke to the agents briefly, then, at their direction, called one of his drug suppliers. After he finished the call, Breslin told defendant that his bond would be reduced so that he could get out of jail.

¶ 25    Defendant testified that the day after he was released from jail, the agents contacted him and told him that he would need to help with the investigation. Shortly afterward, the federal

prosecutor spoke to him, saying nothing about the state case. Defendant worked undercover for about a year and a half, wearing wires and providing the federal agents with information about a specific drug cartel. The agents praised his work, which helped them recover substantial quantities of cocaine, guns, and money. Defendant did everything the agents asked him to do. He received numerous threats along the way and was given money to relocate his family and himself.

¶ 26    Defendant testified that, during this time, he believed that he was helping himself with the state case as well. He explained that, shortly after the case began, Breslin told him that Orland had just told him that, because the agents had said that he was doing great work, she would dismiss the case. Shortly afterward, Breslin telephoned defendant and told him that things were still looking good and that he was going to try to get the case dismissed. At this point, defendant's understanding was that, as long as he continued to do good work, the case "would go away."

¶ 27    Defendant testified that he did not have any conversations with Orland about the case. However, he did have conversations with the federal agents. They never told him that the state case would be dismissed, but they said that they would "go up to bat for [him]" in the case. They told him that, when they heard about Orland's offer for a 10-year prison term, they were "totally shocked."

¶ 28    Defendant testified that in either September or October 2013, he met with Breslin and signed a bond release slip so that Breslin could obtain the proceeds in his absence. Breslin made the request because he believed that the case was going to be dismissed. Until he heard about Orland's offer for a 10-year prison sentence, defendant had believed that he had an agreement with the State that, if he performed well in the federal investigation, his case would be dismissed.

¶ 29    Defendant testified that, on November 7, 2013, he attended a meeting in Orland's office with her, Breslin, and two Carpentersville police officers. Orland told defendant that she wanted

him to provide information on Cavitt, and she had him sign a paper that stated in part that no promises were being made. Defendant answered questions about Cavitt. There was no discussion about a dismissal of the charges against defendant, but defendant still believed that there was an agreement to that effect, because Breslin had told him so and he had not heard differently. Sometime later, defendant heard that the agreement had changed; dismissal had been replaced by probation. However, defendant never believed that the agreement involved his going to prison. Had he so believed, he would not have cooperated with the federal agencies.

¶ 30    Defendant testified on cross-examination as follows. When he first met the federal agents, they immediately told him that they were not there on the state case. They never told him that he was facing federal drug charges. He never believed that the federal government had strong evidence against him in their investigation. At the February 2012 meeting, after Orland heard his phone call, she told him that if he helped the agents "bust this case wide open," she would make his state charges "go away." After that, the only time that Orland spoke to defendant directly was on November 7, 2013, after she and Breslin had spoken in the courthouse hallway. She handed defendant two papers: one had the 10-year offer and the other told him that there was no agreement in return for his assistance in the Cavitt case.

¶ 31    Defendant testified that the federal agents never promised him a specific reward for his cooperation. He signed a statement that the federal government did not promise him anything for his cooperation. However, Perrine did tell him at times that, by aiding the federal investigation, he was helping himself with his state case. On redirect, defendant testified that he had believed that Perrine was working for the State as a state police member.

¶ 32    Defendant rested.

¶ 33    The State called Craig Grywalsky, one of the federal agents with whom defendant had worked.  He testified on direct examination as follows.  He was a special agent with the Drug Enforcement Administration (DEA).  On January 31, 2012, he and Perrine interviewed defendant at the jail.  At the time, Perrine was a Rockford police officer assigned to SLANT as a deputized task force officer with the DEA.  Grywalsky told defendant that he was a federal narcotics agent involved in a federal investigation and was there to talk exclusively about that matter and not about defendant's state case in any way.  Grywalsky then stated that he wanted to speak to defendant about aiding the investigation.   The federal prosecutor would be made aware of any such cooperation.  After defendant was released from jail, Grywalsky met with him several times.  On February 6, 2012, defendant signed a confidential-source agreement.  Grywalsky explained to him that the only promise he would make to defendant is that the federal and state prosecutors would be made aware of everything he was doing.

¶ 34    Grywalsky testified that defendant received money to help him relocate after the investigation.  He made it clear to defendant that his influence was on the federal level only and that all he could do in the state case was speak on his behalf about his aid to the federal investigators.  Grywalsky never heard any other federal agent tell defendant that he would get any benefit in the state case other than the agents' speaking on his behalf to the prosecutors.

¶ 35    Grywalsky testified on cross-examination that defendant's cooperation had been essential to the eventual success of the investigation.  Based on the number of arrests and the drugs and assets seized, the case was the largest of Grywalsky's professional career.  Defendant cooperated fully throughout his time and was the best confidential source that Grywalsky had ever had in his career.  Although Grywalsky never asked defendant about the facts of the state case, he spoke to Orland about defendant's excellent work.  Orland said that she would take the information under

advisement but that the outcome of the state case would be decided solely by the State. Grywalsky testified on redirect examination that Orland never told him that she had agreed to dismiss defendant's case because of his federal work. Grywalsky never asked her to dismiss the case.

¶ 36 Perrine testified on direct examination as follows. In February 2012, he was a Rockford police officer assigned to SLANT and deputized by the DEA's Madison, Wisconsin, office. Perrine had numerous conversations with defendant and Breslin about the investigation. He never told either one that he was offering defendant credit in his state case. In mid-to-late 2013, defendant asked Perrine numerous times about what credit he would get in state court for his cooperation. Perrine always responded that everything defendant had done would be relayed to the attorneys in the case. He never told defendant that his state case would be dismissed or that his undercover work could lead to a dismissal. Orland never told Perrine that she was going to dismiss the state case. Perrine never asked Orland to give defendant credit for his work on the federal investigation and, to his knowledge, neither did any federal agent.

¶ 37 Perrine testified on cross-examination that, in January and February 2012, he was employed by the Rockford police department, a state agency. SLANT was also a state agency. Perrine was involved with defendant from February 2012 until December 2013. Defendant's work was "stunning"; he "definitely overachieved." In the months leading up to October 2013, defendant asked Perrine about the state case. Perrine told him that everything he did in the case would be relayed to all the attorneys involved and that it was their decision what to do; he had no power. Perrine and Grywalsky spoke to Orland about defendant's work and praised it very highly.

¶ 38 Perrine testified on redirect examination that, in the initial meeting with defendant, Orland, and Breslin at the jail, Orland never said or suggested in any way that if defendant cooperated in

the federal investigation, he would get credit or a dismissal in the state case. Instead, she was there only to facilitate the meeting between defendant and the agents.

¶ 39    Orland testified on direct examination as follows. Since December 2008, she had been the supervisor of the drug unit of the Kane County State's Attorney's Office. She had been involved in agreements with defendants who cooperated. All these agreements had been in writing. That way, everyone involved knew the terms and what was expected of each party. She had never entered into an oral agreement with a defendant to cooperate in a felony case.

¶ 40    Orland testified that she was the prosecutor in defendant's case. The lead charge had a minimum sentence of 15 years. She believed that the case against defendant was strong.

¶ 41    Orland testified that she never entered into any agreement with defendant to dismiss the case. Nobody from the federal government asked her to give defendant credit in the state case based on his cooperation with the federal investigation. Orland never told defendant or Breslin that she would dismiss the case. She had no authority to dismiss a case of this magnitude without the approval of her supervisor.

¶ 42    Orland testified that, at the initial meeting at the jail, her role was solely to introduce defendant to the agents. She never told him that his case would go away if he cooperated with the federal investigation. Orland did not directly discuss the potential outcome of the case at all. At that point, she had no reason to give defendant any benefit in the case.

¶ 43    Orland testified that she eventually entered into plea negotiations with Breslin. She prepared a contract for defendant to testify against Cavitt in exchange for a 10-year sentence on a reduced charge. As best she could recall, she made this offer in March 2014. Previously, she had discussed with Breslin a request for a bond reduction so that defendant could work undercover in the federal investigation. During these discussions, she never told Breslin that she would dismiss

the case if defendant aided the investigation. Other than the 10-year offer, Orland never made any sort of firm offer to Breslin based on defendant's cooperation against Cavitt. In some discussions, Breslin asked her for an offer that would involve probation for defendant, but she always declined. She told Breslin that the credit that defendant got in the federal proceedings would not also be given in the state case; there would be no "double credit." She also told Breslin that she would consider giving defendant credit if the federal agents told her that defendant had rendered extraordinary assistance to them, but she said that it was premature to talk about that. No federal agent asked her to dismiss the case or to give defendant any credit in it.

¶ 44    Orland testified that, on October 10, 2014, she had more than one conversation with Breslin. In the first one, Orland noted that it was the deadline for defendant to accept the 10-year offer and that unless he did, it was time to set his case for trial. Breslin and Orland had a heated conversation, after which the case was called and they appeared in court. Later that day, as she was walking to a hearing in another case, Breslin told her that she "better speak to [him] about this case" and "better be ready for the phone call and what's to come with it." Orland walked away.

¶ 45    Orland testified on cross-examination as follows. She did not answer discovery in defendant's case until June 2015. The case was continued for a long time so that defendant could complete his work for the federal investigation. Orland never agreed with Breslin that he could keep defendant's bond money; that would have been inconsistent with her policy. At the in-chambers conference in November 2013, Breslin told her that he believed that he should be getting the bond money returned. However, she told him that she disagreed because the case was still pending and she did not expect the bond money to go back to him. During the heated conversation on October 10, 2014, Breslin never told her that she had promised to dismiss the case based on defendant's completion of his cooperation with the federal agents.

¶ 46    The State rested.  Judge Barsanti stated that he had no personal recollection of the in-chambers conference or knowledge that there had been one.  Thus, his decision would be based solely on the evidence at the hearing.

¶ 47    After hearing arguments, the court stated as follows.  Defendant's work was wholly satisfactory to the federal authorities; indeed, it was outstanding.  He "certainly acted as if he had some kind of an offer and *** he accepted it."  Thus, the pivotal issue was whether the State had agreed to dismiss the charges upon defendant's successful completion of his federal tasks.

¶ 48    The court considered the evidence.  First, the federal prosecutor's proffer promised only that defendant's statements could not be used against him in any case-in-chief.  It said nothing about a disposition of the state case.  Second, the confidential-source agreement with the federal prosecutor stated that it did not apply to any other prosecutor or court.  Third, defendant's proffer agreement of February 1, 2012, with the State's Attorney's office, the Carpentersville police department, the Illinois State Police, and the DEA (the agreement was actually signed February 6, 2012) stated that the sole consideration provided to defendant was that none of what he told law enforcement agents could be used in any case-in-chief.  The agreement did not contemplate any other consideration.  Fourth, Breslin's letter to Kane County State's Attorney McMahon, written immediately after Orland had made the 10-year sentence offer, did not mention any agreement or offer between the State and defendant.  The federal agents testified consistently that they did not promise, and could not have promised, that the State would give defendant any benefit based on his undercover work for the DEA.

¶ 49    The court noted that, to prove the alleged agreement, defendant relied on (1) Orland's alleged off-the-record statement to Breslin in court, which statement Orland denied making, and (2) the absence of discovery in the case.  The court concluded that this evidence was insufficient

and specifically found "the evidence of [Orland] and the law enforcement officers to be more credible than that of [defendant] and Attorney Breslin." Orland's testimony was corroborated by the lack of any written record of the alleged agreement. Although defendant and Breslin might have been operating under the impression that defendant's work for the DEA might lead to a dismissal of his state case, there were no objective facts to show such an agreement, and subjective impressions were immaterial. Thus, as there was no agreement, the motion to dismiss was denied.

¶ 50 On June 20, 2016, the public defender was allowed to withdraw. On March 10, 2017, the trial court held a hearing at which Peter Buh, a private attorney, represented defendant. Orland presented the court with the parties' agreement: defendant would enter an open plea of guilty to count I, which had a sentencing range of 15 to 60 years' imprisonment. However, defendant would not go into custody. If he appeared in court on April 6, 2017, the State would agree to allow him to withdraw his plea and enter one to possession with intent to deliver 400 grams or more but less than 900 grams of a substance containing cocaine, which has a sentencing range of 8 to 40 years' imprisonment. 720 ILCS 570/402(a)(2)(C) (West 2012). The parties would also agree that defendant would be sentenced to 14 years' imprisonment. Count II would be dismissed. If defendant did not appear on April 6, 2017, the court would set the matter for sentencing in his absence on the guilty plea to the original count I.

¶ 51 The trial court duly admonished defendant. The State provided the following factual basis for the plea. On January 17, 2012, defendant met with undercover officers inside a McDonald's in Carpentersville, having spoken to one of them earlier and arranged to meet so he could purchase a kilogram of cocaine. Defendant retrieved a bag of money from a vehicle, entered the undercover officer's vehicle, counted out approximately $39,000 in cash from the bag, and accepted the kilogram of cocaine and set it next to him. At that point, he was arrested. He admitted that he

purchased the cocaine with the intent to deliver it. Laboratory tests confirmed that the substance contained cocaine and weighed more than 900 grams.

¶ 52    Defendant stipulated to the factual basis. He told the court that he still wanted to plead guilty. The court found that defendant had entered a voluntary and knowing plea.

¶ 53    On April 6, 2017, defendant appeared in court, withdrew his original plea, and entered a plea to the reduced charge for the agreed 14-year sentence. The court duly admonished him. The State repeated the factual basis from the prior hearing, except that, for purposes of the plea, the amount of the substance was 400 grams or more but less than 900 grams. The court accepted the plea and admonished defendant of his appeal rights. Among the admonishments was that, before defendant could appeal, he would first have to present, within the next 30 days, a written motion to withdraw the guilty plea; that any grounds not raised in the motion would be waived on appeal; that, if the court denied the motion, defendant would have 30 days therefrom to file a notice of appeal; and that the issues on appeal would be limited to those matters that he had set forth in his motion to withdraw the plea. Defendant told the court that he understood his appeal rights. The court entered the judgment.

¶ 54    Defendant did not file a motion to withdraw his guilty plea. On June 23, 2017, we allowed the State Appellate Defender's Office to file a late notice of appeal on his behalf. Later, the appellate defender moved to withdraw on the basis that defendant's failure to file a motion to withdraw his guilty plea required the dismissal of the appeal.. We agreed and dismissed the appeal. *People v. Dunn*, No. 2-17-0414 (2018) (unpublished summary order under Supreme Court Rule 23(c)).

¶ 55    On October 6, 2017, defendant filed a *pro se* petition under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)), alleging that he had had a cooperation

agreement with the State and thus his conviction violated due process. On June 21, 2018, on the State's motion, the trial court dismissed the petition. Defendant appealed, but later the appeal was dismissed on his own motion. *People v. Dunn*, No. 2-18-0569 (Jan. 11, 2020) (unpublished minute order).

¶ 56    On September 6, 2018, defendant filed a *pro se* motion to withdraw his guilty plea, alleging various errors. On September 28, 2018, the trial court dismissed the motion as untimely and thus outside the court's jurisdiction to consider.

¶ 57    On October 24, 2018, defendant filed the *pro se* postconviction petition that is the subject of this appeal. As pertinent here, the petition alleged as follows. The parties had an oral agreement. At some point, defendant asked Breslin to get the agreement put into writing, but Breslin declined and told defendant just to do his part. In March 2017, defendant's new attorney told him, "[T]ake the next offer[,] you can appeal your case." Defendant did not want to plead guilty, because he had an agreement with the State, but he did so based on his attorney's advice. Only later did he learn that, by pleading guilty, he could not "address any of [his] issues." Defendant's counsel was ineffective for providing the misleading information that induced defendant to plead guilty. The *pro se* petition did not contend that defendant's plea counsel had been ineffective for failing to file a motion to vacate the judgment and withdraw the guilty plea.

¶ 58    In a separate section, defendant contended, with no supporting factual allegations or specific legal argument, that the State had entrapped him into committing the offense to which he later pleaded guilty.

¶ 59    The trial court held that the *pro se* petition was frivolous. The court explained that the petition appeared to contend primarily that the State violated its cooperation agreement with defendant and that his attorneys were ineffective for failing to obtain the benefit of the agreement

for defendant. The court noted that the trial court presiding over the case had specifically found, after an evidentiary hearing, that there had been no such agreement. Further, (1) the State never promised defendant any benefit based on his work in the federal investigation, (2) defendant could not use the Act to relitigate his motion to dismiss the case, (3) defendant had entered a knowing and voluntary plea of guilty, and (4) there was no merit to his claims of due process violations or ineffective assistance of counsel. After the court dismissed his petition, defendant timely appealed.

¶ 60                                II. ANALYSIS

¶ 61      On appeal, defendant contends that his *pro se* petition stated the gist of a meritorious claim that his plea counsel, Buh, was ineffective for inducing him to plead guilty by advising him that he could still appeal the denial of his motion to dismiss. Thus, defendant argues that he showed both deficient performance, in that counsel's advice was legally unsound, and prejudice, in that, had he been properly advised, he would have gone to trial to preserve his claim of error.

¶ 62      The State responds that defendant's claim—that his guilty plea was not knowing—has been forfeited and, in any event, lacks merit. The State responds further that Buh's performance was neither unreasonable nor prejudicial. Finally, the State contends that defendant's petition was an improper attempt to relitigate the existence of an alleged oral agreement, an issue previously decided when the trial court dismissed his section 2-1401 petition. We need not decide all of the possible grounds for affirmance that the State raises. We affirm on the basis that defendant's claim of ineffective assistance of counsel—the only claim on which he seeks reversal—is frivolous. Even if defendant's petition satisfied the performance prong of the test for ineffective assistance, it fails the prejudice prong.

¶ 63      A trial court may dismiss a petition that is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018); *People v. Tucek*, 2019 IL App (2d) 160788, ¶ 14. A petition needs

to state only the gist of a meritorious claim of a constitutional violation to survive summary dismissal. *People v. Edwards*, 197 Ill. 2d 239, 244-45 (2001). The petition's well-pleaded allegations must be taken as true and construed liberally. *Id.* at 244. We review *de novo* the summary dismissal of a petition under the Act. *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998).

¶ 64 To prevail on a claim of ineffective assistance of counsel, a defendant must establish that (1) counsel's performance was objectively unreasonable and (2) he was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Tucek*, 2019 IL App (2d) 160788, ¶ 14.

¶ 65 Defendant's petition can be liberally construed to allege that Buh advised him that pleading guilty would not preclude his contending on appeal that the trial court erred in denying his motion to dismiss. If so, that could support a claim of unreasonable performance, as the law is and was then clear that a voluntary and knowing guilty plea waives all nonjurisdictional errors, including constitutional ones. *People v. Townsell*, 209 Ill. 2d 543, 545 (2004). Nonetheless, we say no more about the performance prong, as the petition's allegations relating to the prejudice prong do not satisfy even the Act's low threshold for surviving summary dismissal.

¶ 66 To satisfy *Strickland*'s prejudice prong, the petition needed to raise the gist of a meritorious allegation that it is reasonably probable that, absent counsel's error, defendant would not have pleaded guilty but would have insisted on going to trial. *People v. Valdez*, 2016 IL 119860, ¶ 29; *Tucek*, 2019 IL App (2d) 160788, ¶ 17. "Needed were facts to show that the decision to reject the plea bargain would have been rational under the circumstances." *Id.*

¶ 67 Where, as here, the allegedly deficient representation involved not defense strategy or the chance of an acquittal but instead the consequences of a guilty plea, the defendant need not articulate a claim of innocence or a plausible defense. *Tucek*, 2019 IL App (2d) 160788, ¶ 18. However, he must raise more than a bare allegation that, absent counsel's errors, he would have

spurned the guilty plea and proceeded to trial. *Id.* The relevant circumstances are still crucial to assessing prejudice and thus making the required showing that the decision to proceed to a trial would have been rational. *Id.* These circumstances include the probability of an acquittal (which necessarily subsumes the existence of a plausible defense) and the potential penalties. *Id.* We conclude that the petition raised little more than the bare allegation that, absent Buh's allegedly erroneous advice, defendant would have rejected the plea offer and proceeded to trial. The relevant circumstances point the other way.

¶ 68    We consider first the probability of an acquittal. Defendant all but concedes that this circumstance militates strongly against him. The record overwhelmingly supports this conclusion. From the beginning, no one has disputed that defendant (1) arranged to purchase cocaine from undercover police officers; (2) went to the meeting place and handed an officer a bag containing approximately $39,000; (3) took from the officer more than 900 grams of a substance that contained cocaine; and (4) was promptly arrested and soon confessed. In other words, defendant was caught red-handed, and he knew it. Further, he later agreed to turn State's evidence in the trial of Cavitt, his accomplice. The result of a trial would have been a foregone conclusion in light of the overwhelming evidence of defendant's guilt.

¶ 69    Defendant notes that his petition alleged that he was entrapped into committing the offense, and he argues that the availability of this defense shows a rational basis for taking the case to trial. This argument is frivolous. During the entire five-year history of the case, defendant said nothing on the record about entrapment. In his *pro se* petition, defendant belatedly raised this defense as a pure conclusion. Defendant never made any allegations to suggest that the police induced defendant to commit the offense instead of merely providing him the opportunity to do what he was already predisposed to do. See *People v. Arndt*, 351 Ill. App. 3d 505, 516 (2004). Moreover,

at the time of the offense, defendant already had a substantial history of large-scale drug dealing. Otherwise, he would not have been asked to aid the federal government in investigating major drug trafficking by a powerful drug cartel. Thus, the possibility of an acquittal at a trial was remote at best and militates against a finding of prejudice.

¶ 70 We turn next to the probable penalties. This factor also militates against a finding of prejudice. By accepting the State's plea offer, defendant pleaded guilty to a reduced charge and obtained a prison sentence of 14 years. While this was a substantial penalty, going to trial on the original charge would have subjected defendant to a minimum penalty of 15 years' imprisonment and the possibility of as much as 60 years. Although it was unlikely that the trial court would have imposed anywhere near the maximum, given defendant's admirable work for the federal investigation, even a sentence near the midpoint of the applicable range would have subjected defendant to a far greater term of imprisonment than what he accepted—approximately two decades greater. Thus, by taking the plea offer, defendant avoided an all-but-certain conviction with a penalty that, by law, would have been more severe than what he obtained.

¶ 71 Finally, we note that, however strongly defendant believed that the State had obligated itself to dismiss the charges, the trial court found otherwise. This finding could not have been disturbed on appeal unless it was against the manifest weight of the evidence. See *People v. Dasaky*, 303 Ill. App. 3d 986, 992 (1999). The court made its finding after holding a long and thorough evidentiary hearing. The court relied heavily on witness credibility, finding Orland and the federal agents more believable than defendant and Breslin, and also on the lack of any written evidence of an oral promise by an assistant state's attorney to dismiss a Class X charge. We have recapped the hearing evidence at length to show the futility of seeking a reversal on the ground

that the finding that there was no cooperation agreement was against the manifest weight of the evidence. An appeal on this ground would have been frivolous.

¶ 72    In sum, defendant's claim of ineffective assistance of plea counsel did not satisfy the Act's requirements for further proceedings, and the trial court therefore properly dismissed it.

¶ 73                                III. CONCLUSION

¶ 74    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 75    Affirmed.